LOUIS M. BUBALA III, ESQ.
State Bar No. 8974
ARMSTRONG TEASDALE LLP
50 W. Liberty Street, Suite 950
Reno, NV 89501
Telephone: 775-322-7400
Facsimile: 775-322-9049
Email: lbubala@armstrongteasdale.com
and      bsalinas@armstrongteasdale.com

Counsel for Tilzoni, LLC

**ELECRONICALLY FILED ON
November 1, 2011**

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.:  BK-N-11-52228-BTB |
| STEPHEN FLANAGAN AND CHARLOTTE FLANAGAN, | Chapter 11 |
| Debtors. | **OBJECTION TO DISCLOSURE STATEMENT AND PLAN** |
| | Hearing Date:  Nov. 10, 2011 |
| | Hearing Time: 11:00 a.m. |

Creditor Tilzoni, LLC ("Tilzoni") objects to debtors' disclosure statement and plan.

## 1.   Tilzoni is an undisputed creditor in the case

Tilzoni obtained a default judgment for fraud against Mr. Flanagan in Minnesota after he took funds but failed to build a condominium (See Ct. Dkt. #42, Motion Extending Time to File Complaint to Determine Nondischargeability, filed Oct. 7, 2011; Cl. Reg. #4-1, filed Aug. 4, 2011).[1] Tilzoni asserts a claim for $171,046.58, including interest (Cl. Reg. #4-1).  Debtors have scheduled the judgment as an uncontested debt in the amount of $158,000 (Ct. Dkt. #s 1, 14, Sch. F).  Tilzoni holds an allowed, unsecured claim.

Tilzoni believes its claim is subject to nondischargeability, subject to a determination by this Court either by stipulation or through an adversary proceeding.  The elements for fraud under Minnesota law are consistent with the elements for nondischargeability for fraud.  Compare 11 U.S.C. § 523(a)(2)(A)-(B) with *U.S. Bank, N.A. v. Cold Springs Granite Co.*, 802 N.W.2d 363, 373

---

[1] The motion is filed on behalf of Richard Tillson, formerly doing business as Tilzoni.  It is counsel's understanding that it was done as such because Mr. Tillson provided the funds to Tilzoni.  However, this objection is filed on behalf of Tilzoni because it is the judgment creditor.

(Minn. 2011) (stating elements of fraud under Minnesota law).   The prior default judgment also is preclusive as a matter of Minnesota law in a nondischargeability proceeding.  *North Tel, Inc. v. Brandl (In re Brandl)*, 179 B.R. 620, 626 (Bankr. D. Minn. 1996) (holding that debtor may not relitigate issues from default judgment after failure to answer complaint, citing cases).

**2.   <u>The disclosure statement and plan are both subject to objection</u>**

Debtors received conditional approval of their disclosure (Ct. Dkt. #29, filed Sept. 19, 2011). Creditors and parties in interest still may object to the disclosure statement, L.R. 3017(c), as well as object to the proposed plan of reorganization.

Tilzoni objects on the following grounds, discussed in detail below:

a.  Acceptance of the plan has been solicited from holders of claims without prior or contemporaneous transmission of the plan or a summary of the plan under 11 U.S.C. § 1125(b).

b.  The disclosure statement does not contain adequate information under 11 U.S.C. § 1125(a).

c.  The plan does not provide adequate means for its implementation under 11 U.S.C. § 1123(a)(5).

d.  The plan does not provide for the payment to creditors of all or such portion of earnings from personal services as is necessary for the execution of the plan.  11 U.S.C. § 1123(a)(8).

e.  The proponents have not complied with the applicable provisions of this title under 11 U.S.C. § 1129(a)(2).

f.  The value of the property to be distributed under it is less than the projected disposable income of debtors under 11 U.S.C. § 1129(a)(15)(B).

g.  The plan is not fair and equitable under 11 U.S.C. § 1129(b)(1)-(2)(B)(i).

h.  The plan violates the absolute priority rule under 11 U.S.C. § 1129(b)(2)(B)(ii).[2]

---

[2] Tilzoli recognizes that Judge Markell has limited the application of the absolute priority rule in individual Chapter 11 cases.  *See In re Shat*, 424 B.R. 854 (Bankr. D. Nev. 2010).  The decision is not precedential and has been distinguished or questioned by a number of other courts.

**3.  Debtors have not complied with the requirements to solicit votes for the plan.**

There is no evidence on the court docket of the distribution of the plan.  Based on the absence of that evidence, it appears that Debtors have not properly solicited votes for the plan and that confirmation must be denied until there is evidence of proper distribution and solicitation.

The plan (Ct. Dkt. #24) and disclosure statement (Ct. Dkt. #25) were filed with the court. They do not include certificates of service, and there is no subsequent certificate of service filed with the court for either document.  The order conditionally approving the disclosure statement (Ct. Dkt. #29) was sent to the creditor matrix (Ct. Dkt. #30), but it did not contain the plan or disclosure statement.  The notice of hearing for final approval of the disclosure statement and plan confirmation (Ct. Dkt. #31) contains a ballot, but not the disclosure statement or plan.

Section 1125(b) of the Bankruptcy Code states that "An acceptance … of a plan may not be solicited after the commencement of the case under this title from a holder of a claim … unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan."  Judge Markell has held that "It is of course beyond doubt that a plan may not be confirmed if the proponent solicits votes before approval and distribution of a disclosure statement."  *In re Trans Max Techs., Inc.*, 349 B.R. 80, 86 (Bankr. D. Nev. 2006) (omitting footnote regarding inapplicable pre-petition solicitation under Section 1125(g)).  Judge Markell went on to explain that "Section 1129(a)(2) then elevates Section 1125(b)'s prohibition into a confirmation requirement."  *Id.  See also Andrew v. Coopersmith (In re Downtown Inv. Club III)*, 89 B.R. 59, 65 (BAP 9th Cir. 1988) (per curiam) (holding that proponent may not solicit acceptances to a material modification of a plan unless new disclosure statement transmitted, and that plan cannot be confirmed).

Although it does not appear Tilzoni need provide additional argument regarding the confirmation of the plan at this time, it does so to preserve its rights.  Tilzoni reserves its rights to supplement, alter, withdraw or otherwise amend its arguments to any objection filed prior to a subsequently scheduled hearing on Debtors' disclosure statement and plan.

**4.  Mrs. Flanagan's selection of Nevada exemptions appears improper.**

Both Debtors assert Nevada exemptions (Ct. Dkt. #1, Sch. C).  It appears they impermissibly selected Nevada exemptions for Mrs. Flanagan since she does appear eligible to claim them.

Exemptions "shall apply separately with respect to each debtor in a joint case." 11 U.S.C. § 522(m). Courts have recognized that the evaluation of exemptions is based on the individual circumstances of each of the joint debtors. *In re Connor*, 419 B.R. 304, 305-06 (Bankr. E.D.N.C. 2009) (determining exemptions for spouses residing in different states). Therefore, each of the joint debtors may select available exemptions based on the "State or local law that is applicable on the date of the filing of the petition." 11 U.S.C. § 522(b)(3). If a debtor does not qualify for a specific state's exemptions, the debtor may not claim them. *In re Connor*, 419 B.R. 304, 305-06 (Bankr. E.D.N.C. 2009); *see also In re Howley*, 439, B.R. 535, 541-42 (Bankr. D. Kan. 2010) (holding debtor cannot assert tribal exemption since debtor does not live on reservation).

This body of law is applied to the information contained in Debtors' court filings. Debtors state that they lived at their residence in Hawaii from 1997 through March 2011 (Ct. Dkt. #1, SOFA ¶15).[3] Debtors' also attest that Mrs. Flanagan continues to live at an unspecified address in Hawaii as of the date of the filing of their petition (Ct. Dkt. #1 at 1). Debtors' first monthly operating report also disclosed numerous transactions in Hawaii in the pre-petition weeks leading up to the bankruptcy filing (Ct. Dkt. #19 at PDF Pages 14-17).

There is no evidence that Mrs. Flanagan resided in Nevada, and it appears she is not eligible for Nevada exemptions. 11 U.S.C. § 522(b)(3). Thus, it appears that Mrs. Flanagan is subject to Hawaii's exemption scheme. Hawaii has not opted out of the federal exemptions, but allows its residents to elect state or federal exemptions. Hon. William Houston Brown et al., *Bankruptcy Exemption Manual* App. B12-1 (2010). If Mrs. Flanagan elects the Hawai'i state exemptions, Mr. Flanagan can proceed with Nevada exemptions. But if Mrs. Flanagan elects to take the federal exemptions, then Mr. Flanagan must take the federal exemptions. 11 U.S.C. § 522(b)(1) (federal law trumping Nevada's opt-out provision under NRS 21.090(3)).

Either way, Debtors have not complied with 11 U.S.C. § 522(b)(3) in application of Nevada's exemption law. Therefore, they cannot confirm the plan as written under 11 U.S.C. § 1129(a)(2).

---

[3] Debtors' filings state that Mr. Flanagan resides in Reno, Nevada, and imply that he has been domiciled here sufficient time to claim the Nevada exemptions since he claims them. 11 U.S.C. § 522(b)(3)(A); *see also* Ct. Dkt. #1, SOFA ¶15, prior addresses.

For example, Mrs. Flanagan applied the Nevada exemptions regarding a bank account, and debtors have exempted two vehicles under Nevada law.  There is a difference at least with the vehicles.  While Nevada allows joint debtors to each exempt a vehicle valued up to $15,000 under NRS 21.090(1)(f), Hawai'i limits the exemption to $2,575 under HRS 651-121(2).  It also does not appear there is an exemption for bank accounts under Hawai'i Revised Statutes Chapter 651, Attachment and Execution.  *See Bankruptcy Exemption Manual* App. B12.

Mrs. Flanagan also scheduled an IRA (Ct. Dkt. #14, Sch. B), which is neither exempted (Ct. Dkt. #1, Sch. C) nor liquidated under the proposed plan (Ct. Dkt. #24-25).  Hawai'i exemptions differ from Nevada, in that it does not exempt contributions made within three years before filing for bankruptcy.  HRS 651-124(2).  This is important because Mrs. Flanagan's IRA statement indicates that she did not fund it until June 2011 (Ct. Dkt. #47 at PDF Page 4), the month prior to the filing of the bankruptcy petition (Ct. Dkt. #1).  Therefore, even if she asserted an exemption in these funds, she cannot exempt the funds under the Hawai'i exemptions.  (This does not appear to be a concession by Debtors to her lack of an exemption, since Mr. Flanagan also discloses an IRA but has not sought to exempt it.)

There are also other assets and exemptions that may need to be amended to correctly reflect their interests and the interplay of the exemption laws for Nevada and Hawai'i.  Thus, the plan cannot be confirmed because of the improper application of Nevada exemptions for Mrs. Flanagan.  11 U.S.C. §§ 522(b)(3), 1129(a)(2).  Alternatively, the disclosure statement cannot be approved (and plan confirmed) because there is not adequate information in the disclosure statement (and Debtors' other papers reference therein) about Mrs. Flanagan's location prior to the bankruptcy.  11 U.S.C. §§ 1125(a), 1129(a)(2).

**5.  <u>There may be additional assets available to pay creditors.</u>**

Debtors' monthly operating reports include a bank statement addressed to "CHARLOTTE R. FLANAGAN TR, CATHERINE A. FLANAGAN BENE" (Ct. Dkt. #s 19, 46, 47 at PDF Page 6). Based on the account number, Debtors describe this account as Mrs. Flanagan's checking account (Ct. Dkt. #s 19, 46, 47 at PDF Page 3; Ct. Dkt. #s 1, 14, Sch. B).

But Debtors do not disclose anything about the trust.  It is not listed in Debtors' personal property (Ct. Dkt. #s 1, 14, Sch. B).  Debtors' court papers also do not identify a "Catherine A. Flanagan."  The best that can be surmised from bank statements is that Mrs. Flanagan is the trustee of a beneficial trust.  Debtors should disclose the details and financial information of the trust, including details about its trustor and beneficiary, as well as any history of financial contributions to or withdrawals from it, and any planned financial contributions to or withdrawals from it.  While this may be more information that ordinary scheduled, Debtors should provide these additional details since the asset was not scheduled and only identified through a creditor's parsing of the record.

Absent this information, the plan cannot be confirmed because the omission does not comply with Debtors' obligation to schedule their assets, 11 U.S.C. §§ 521(a)(1)(B)(i), 1129(a)(2); the disclosure statement does not contain adequate information about this asset, 11 U.S.C. §§ 1125(a), 1129(a)(2); the plan does not provide adequate means for its implementation since it appears an asset is omitted, 11 U.S.C. §§ 1123(a)(5), 1129(a)(2); depending on the funding of the trust, the plan does not provide for the payment of creditors of all or such portion of earnings from personal services as is necessary for the execution of the plan, 11 U.S.C. §§ 1123(a)(8), 1129(a)(2); depending on the funding of the trust, the value of the property to be distributed under the plan is less than the projected disposable income of debtors, 11 U.S.C. § 1129(a)(15)(B); the plan is not fair and equitable, 11 U.S.C. § 1129(b)(1)-(2)(B)(i); and the plan violates the absolute priority rule, 11 U.S.C. § 1129(b)(2)(B)(ii).

**6.  Debtors do not contribute sufficient assets to fund their plan.**

Tilzoli objects to the plan because it does not contribute sufficient resources to pay unsecured creditors.  Debtors intend to maintain all three residences even though each of them has significant debt secured against them without any equity for Debtors or unsecured creditors.  Debtors apparently want to use their cash in a real estate gambit, continually funding the properties in hopes that the market comes back for their benefit, rather than utilizing their income to fund payments to unsecured creditors.  Additionally, there are specific payments that Debtors seek to make under the plan that are either inappropriate, or there simply is insufficient information disclosed about the payments to determine their propriety.

### A.  Tilzoli objects to Debtors' continued real estate speculation

Debtors schedule three pieces of real property:

1.   The Hawai'i property, valued at $1.2 million with secured debt of $1.89 million.

2.   The Nevada property, valued at $350,000 with secured debt of $538,000.

3.   The Minnesota property, valued at $35,000 with secured debt of $152,000.

(Ct. Dkt. #1, Sch. A).  Mr. Flanagan identifies the Nevada property as his residence on the petition (Ct. Dkt. #1 at 1).  Mrs. Flanagan does not identify her residence except to state is in the same city in Hawai'i where their Hawai'i property is located.

Debtors list the Hawai'i and Minnesota properties as rentals in their monthly operating reports (Ct. Dkt. #s 19, 46, 47 at PDF Page 3).[4]  Debtors calculate the Hawai'i property's scheduled gross rents at $8,000, but state they are only receiving $6,500.  *Id.*  Debtors state the Minnesota property should rent for $900, but it has been vacant for the three months that Debtors filed monthly operating reports.  *Id.*

Debtors' plan seeks to continue to rent the properties.  They estimate they will received $7,500 in average monthly income from their rental real estate (a figure that only occurs if both properties are rented) (Ct. Dkt. #25, Disc. St. at 27).  Yet it appears this entire amount is consumed by the cost of the rentals.  Debtors project that they will pay $6,500 a month on their secured debts under the plan other than Mr. Flanagan's residence in Nevada. Id.  Debtors also project paying $800 a month in insurance costs, which appear to include insurance on the rental properties.  If it does not, Debtors should disclose their insurance obligations on the rental properties.  Additionally, Debtors anticipate paying $700 a month in household maintenance and repairs (including the rentals).  It is unclear how Debtors have accounted for utility expenses for the rentals.  They have disclosed $1,500 a month in personal utility costs.  Given that the Minnesota property has been vacant, there must be utility costs that Debtors are obligated to pay if they intend to keep the rentals.  Those figures are not disclosed or readily obvious from the plan.

---

[4] However, Debtors list the Hawai'i property as residential and the Nevada and Minnesota properties as rentals on the balance sheets attached to their monthly operating reports, based on the valuations listed there (Ct. Dkt. #s 19, 46, 47 at PDF Page 2).

Debtors' plan calls for what rental receipts assuming occupancy and payments from tenants on their two rental properties.  The costs associated with the two properties appear to equal or exceed the rent income.  Debtors will be required to contribute their personal income to maintain these properties, particularly if they are ever vacant.  Tilzoli objects to the expenditure of Debtors' funds in this manner and asserts they should go to pay unsecured creditors.

Tilzoli objects on the grounds that the disclosure statement does not contain adequate information; the plan does not provide adequate means for its implementation; the plan does not provide for the payment to creditors of all or such portion of earnings from personal services as is necessary for the execution of the plan; the value of the property to be distributed under it is less than the projected disposable income of debtors; the plan is not fair and equitable; and the plan violates the absolute priority rule under 11 U.S.C. § 1129(b)(2)(B)(ii).

**B.  Tilzoli objects to payment of educational expenses**

Debtors estimate that they only have $1,450 in disposable monthly income to contribute to the plan (Ct. Dkt. #25, Disc. St. at 27).  This estimate includes an expense of $400 per month for education expenses for minor children.  *Id.*; *see also* Ct. Dkt. #1, Sch. J, Current Expenditures at #17; Ct. Dkt. #26, Application to Approve Expenses at 5.

Debtors do not elaborate on this expense, but it appears that debtors are paying tuition to send their child(ren) to private school.  Their monthly operating reports disclose a payment of $1,252.23 to "St. John Vianney" on August 31, 2011 (Ct. Dkt. #47 at PDF Page 12).  St. John Vianney is a Catholic church that operates a parish school in Kailulu, Hawaii, five miles from Debtors' long-term home in Hawaii.  *See* St. John Vianney School, http://sjv-school.org/SJV_Site/About_Us.html; *see also* http://maps.google.com (calculating distance from home to school).

As an initial step, if debtors continue to send their children to private school in Hawaii, then debtors' exemptions should be subject to further review.  If debtors do not send their children to school in Hawaii, then they should disclose where they send them to school and the costs.  If debtors are not sending their children to private school, these costs should be added back to their disposable income available for plan payments.

But as it stands, the plan should not be confirmed with the inclusion of this expense. "When a debtor seeks Chapter 13 relief, 'the entire family is affected by the sacrifices and special efforts required by the Code. [A] family may not continue its prepetition lifestyle to the detriment of creditors.'" *In re Bacon*, 449 B.R. 536, 541 (Bankr. E.D. Ark. 2011), *quoting In re Trimarchi*, 421 B.R. 914, 923 (Bankr. N.D. Ill. 2010). Bankruptcy courts have sustained objections to plans that include payments for private school tuition. *See id.* (denying confirmation when debtor sought to continue to pay private school, but was no longer proposing 100 percent plan.); *see id., citing In re Daniel*, 260 B.R. 763, 765 & 768 (Bankr. E.D. Va. 2001). One court affirmed the denial of confirmation when the debtor sought to pay private school tuition with just a 20 percent dividend to unsecured creditors. *Lynch v. Tate (In re Lynch)*, 299 B.R. 776 (W.D.N.C. 2003). *Cf. United States v. Villalobos (In re Villalobos)*, Case No. NV-11-1061-HKwJu, 2011 WL 4485793, *3 (BAP 9th Cir. Aug. 19, 2011) (mem.) (reversing order approving payment of ordinary expenses that included private school tuition for debtor's grandchildren).

In this case, debtors project to pay a 7 percent dividend to unsecured creditors, and with payments that do not start for a year and half after confirmation because they are paying their legal fees for the first 18 months (Ct. Dkt. #24, Plan at 4:6-7, 7 percent payment; *id.* at 9 & 12, payments to priority and unsecured claims). Debtors should not be permitted to make a *de minimis* payment to their creditors if they are paying to send their children to private school.

This expense shields a substantial amount of funds from payment to creditors under the plan. The exact amount is unclear, because the plan is internally inconsistent. Section 4.8 provides that any unsecured claims unpaid after 60 months following confirmation is discharged (Ct. Dkt. #24, at 12). However, Section 7.1 states the plan will be funded with 83 monthly payments to pay priority legal expenses and unsecured creditors (Ct. Dkt. #24 at 14). The more specific Section 7.1 should prevail. *See generally, e.g., Block v. Texas Commerce Bank, N.A. (In re Midwestern Cos.)*, 102 B.R. 169, 173 (W.D. Mo. 1989) (applying more specific provision of Bankruptcy Code). Therefore, the plan shields $33,200 in payments for the educational expenses of debtors' children, rather than paying the unsecured creditors.

Even if debtors should be able to shield funds to pay their children's education expenses, they

have not made any showing that they should exempt that amount for the length of the plan.  Although debtors' identify three children as dependents, they do not identify their ages are called for on the official bankruptcy schedules (Ct. Dkt. #1, Sch. I, Current Income).  It is impossible to determine whether the children should qualify as dependents for the length of the plan without their ages.  As Judge Myers noted, the Bankruptcy Code does not define "dependent," and the determination may be fact intensive.  *In re Bauer*, 309 B.R. 47, 49-52 (Bankr. D. Idaho 2004).  Therefore, if debtors may pay additional education expenses for their children, they should be required to specify the ages of their children and elaborate on the expenses.

### C.  Debtors' plan should address payments to retirement plans, disability and charity

Debtors should be required to specify whether they seek to make retirement contributions under the plan and/or repay a prior loan from Mr. Flanagan's 401(k) plan.  It is impossible to tell from Debtors' statement that Mr. Flanagan projected "take home income from employment" will be $7,450 per month, while Mrs. Flanagan's "income from employment" will be $4,000 (Ct. Dkt. #25, Disc. St. at 27).  It is unclear the distinction created by adding the phrase "take home" to describe his income but not her income.  Debtors should be required to specify whether these calculations include 401(k) or other withholdings for ERISA-qualified plans, or repayment of loans from plan.

The distinction may raise from the information on Schedule I, Current Income of Individual Debtor(s) (Ct. Dkt. #1).  There, Mr. Flanagan lists monthly payroll deductions of $534.53 for "401(k) loan" and $117.50 for "disability."  It is not clear what is meant by either payroll deduction, and Debtors should elaborate.  Presumably, the fore means Mr. Flanagan borrowed funds from his 401(k) account and is repaying them.  This debt is not disclosed in Debtors' schedules and statements or other court filings contrary to Debtors' statutory obligations.  11 U.S.C. § 521(a)(1)(A)-(B)(i).  If Debtors seeks to repay the loan, they should at a minimum specify the amount of the loan and identify the creditor.

But it does not appear proper for Mr. Flanagan to repay the loan when he proposed a plan that provides a delayed, 7 percent payout to unsecured creditors.  *See Egebjerg v. Anderson (In re Egebjerg)*, 574 F.3d 1045, 1051-52 (9th Cir. 2009) (holding 401(k) loan repayment was not reasonably necessary as part of means test); *Craig v. Educational Credit Mgmt. Corp. (In re Craig)*,

579 F.3d 1040, 1046-47 (9th Cir. 2009) (holding 401(k) contribution was not reasonably necessary). Mr. Flanagan's annual income approximately $150,000 a year, and he is exempting nearly $300,000 in retirement savings. He and his wife sheltered an additional $11,000 with contributions to Roth IRAs in the days before they filed their bankruptcy petition. Debtors also have opted in the plan to retain two pieces of commercial real estate, and it appears one of them drives a Mercedes that they bought days before filing the bankruptcy petition. If life is about choices, Debtors have made theirs. But in doing so, they should not be allowed to continue to repay the 401(k) loan while paying almost nothing to unsecured creditors in this case.

Additionally, Debtors propose to pay $200 a month to charity under the plan. As noted below, there is no evidence in the record to suggest that Debtors have made any charitable contributions in the year before the bankruptcy or in the three months for which they filed monthly operating reports. They should not be allowed to deduct this amount from their income use to pay unsecured creditors.

### D.  Debtors' plan improperly delays payment on the plan

Debtor unreasonably delays commencement of payments under the plan. The determination of the commencement day requires interpretation of multiple provisions. The plan provides that payments "Commenc[e] on the fifth day of the first month following the Effective Date of the Plan" (Ct. Dkt. #24 at 14:14-15). The Effective Date is defined as "the first day of the first month at least thirty (30) days following the Confirmation Date." *Id.* at 7:25-26. The Confirmation Date s defined as "the date on which the Court enters its Order confirmed Debtors' Plan of Reorganization." *Id.* at 7:4-6.

Assuming, *arguendo*, that the court approves the plan of reorganization and enters the confirmation order shortly after the hearing, the Confirmation Date will be a date in November 2011. The Effective Date is calculating by advancing 30 days to date in December 2011, then to the first day of the first month following that date—so January 1, 2012 is the Effective Date. Then plan payments start in the first month following the Effective Date, so in February 2012, and on the fifth day of that month. Therefore, plan payments do not commence until February 5, 2012. Debtor will not have to make any payments for three months from the time of confirmation.

Given that debtors have avoided making payments to their creditors for at least the five months they have been in bankruptcy, they should not get this additional time before commencing payments. Counsel does not have written authority for the proposition, but has been advised orally by the Honorable Gregg W. Zive in dicta that 90 days is an unacceptably long time to delay payments. *In re Big Stuff Storage, LLC*, Case No. BK-N-10-50741-GWZ (Bankr. D. Nev.) (March 23, 2011, hearing on creditor's motion to compel post-confirmation payments).

The proper date to commence payments should be the first day of the first full month following the oral confirmation of a plan of reorganization. As noted, debtors already have gained the benefit of the automatic stay in avoiding any payments to their creditors during the pendency of the bankruptcy case. They should promptly commence payments after confirmation. Absent this revision, the plan should not be confirmed as drafted.

**7.  The Disclosure Statement does not contain adequate information, and the underlying documentation is vague, ambiguous, conflicting, omitted, or incorrect**

Debtors' disclosure statement should not be approved, nor the plan confirmed, based on the omission of information, and incomplete or insufficient descriptions in Debtors' papers.

**A.  There is not sufficient information about events leading to the bankruptcy**

The disclosure statement does not adequately disclose the events leading to their Chapter 11 filing (Ctk. Dkt. #25 at 10). The disclosure statement provides a perfunctory statement that "Mr. Flanagan was involved in a large community development in Minnesota, which was not completed and resulted in substantial liabilities for Mr. Flanagan." *Id.* The statement does not provide any additional information about Mr. Flanagan's role, the problems with the development, his obligations, or co-obligors on the debt. Mr. Tillson is particularly interested to learn more about Debtors' statements about this since Mr. Flanagan is subject to a $171,000 default judgment for fraud owed to Mr. Tillson over undeveloped property in Minnesota.

The Debtors also attribute their financial troubles to their separation and maintenance of separate households. There is no other information in the disclosure statement; debtor's petition merely states that Mr. Flanagan is residing at their property in Reno, Nevada, and Mrs. Flanagan resides as un unspecified location in Hawai'i. While not seeking to unnecessarily intrude on

Debtors' marital relationship, Debtors should be compelled to provide more information.  Debtors cited this as one of three factors that allows them to pay their unsecured creditors an estimated 7 cents on the dollar.  At a bare minimum, Debtors should be required to state when they separated; whether their separation is subject to any court proceedings; where they lived prior to the separation; when they stopped living together; the address where each has lived since they separated, and the time periods if they have at multiple locations; the name, address, and contact information for any landlord; monthly statements of the rent or mortgage owed and paid on each location; and monthly designations of the utilities associated for each location.  Debtors also should be compelled to disclose which debtor has custody of their three minor children.

The third factor Debtors identify as contributing to their bankruptcy is the "nationwide economic recession and the related real estate market collapse.  The collapse ahs impacted the rental income of the Debtors and their ability to operate their rental properties profitably."  Id.  The plan does not provide information about the history of their rental properties, including rental rates and vacancies.  Debtors should be compelled to elaborate to show the change in rental rates and vacancies, including disclosure of their current rental status and rates.  To the extent the rental properties have been occupied or rented by the Debtors or insiders over the past two years, Debtors should be obligated to disclose the tenants and what, if any, rent was charged and paid.

**B.   There are deficiencies in Debtors' schedules, statement of affairs, and monthly operating reports**

Debtors' disclosure statement incorporates by reference their schedules and statement of financial affairs to disclose their financial status at the time of the bankruptcy, and their monthly operating reports to disclose their ongoing financial status (Ct. Dkt. #25 at 10).  A review of these documents reflects inconsistent entries and omissions that should be either corrected or explained to provide adequate information about the bankruptcy.  11 U.S.C. § 1125.  Additionally, the errors in their schedules and statements, and in their monthly operating means Debtors are not in substantial compliance with their reporting obligations. 11 U.S.C. § 521 and Fed. R. Bankr. P. 1007 (schedules); 11 U.S.C. §§ 704(a)(8), 1106, 1107(a) and Fed. R. Bankr. P. 2015(a)(3) (monthly operating reports).  Thus, the proponents have not complied with the applicable provisions of this title and cannot

1    confirm their plan.  11 U.S.C. § 1129(a)(2).

2                  --The petition requires Debtors to disclose their street addresses.  Debtors' petition

3    does not disclose the street address for Mrs. Flanagan (Ct. Dkt. #1 at 1)

4                  --Debtors do not disclose the nature of their interest in their property in Hawaii (Ct.

5    Dkt. #1, Sch. A).

6                  --Debtors disclosed individual IRAs valued at $13,000 each (Ct. Dkt. #14, Sch. B,

7    ¶12).  Debtors' monthly operating report contains statements reflecting approximate values of $5,500

8    for Mrs. Flanagan's account and $10,000 for Mr. Flanagan's account (Ct. Dkt. #47 at PDF Pages 37-

9    52).  Debtors' monthly operating reports also do not include these amounts in their balance sheets

10   (Ct. Dkt. #s 19, 46, 47 at 2:14).  Debtors should amend these inconsistent entries.  To the extent the

11   IRAs are not exempted, they should be liquidated and provide payment for unsecured creditors.

12                 --Debtors schedule three vehicles valued as a combined value of $22,150 (Ct. Dkt. #s

13   1, 14, Sch. B, ¶25).  In their monthly operating reports, Debtors value their vehicles at $28,000 (Ct.

14   Dkt. #19, 46 & 47 at 2:10).  Debtors should amend these inconsistent entries.

15                 --Debtors do not disclose the ages of their dependent children (Ct. Dkt. #1, Sch. I).

16                 --Debtors list a combined $300 per month in charitable contributions (Ct. Dkt. #1,

17   Sch. J.).  However, they do not disclose any charitable contributions in the prior year (Ct. Dkt. #s 1,

18   14, 15 SOFA ¶7).  Debtors' monthly operating reports do not clearly disclose any such contributions.

19   Debtors should amend these inconsistent entries.

20                 --Debtors state that they did not make any payments to creditors in the aggregate of at

21   least $600 per creditor in the ninety days before the petition, and for any payments made to or for the

22   benefit of insiders in the one year prior to petition (Ct. Dkt. #s 1, 14, 15, SOFA ¶3).  This answer

23   seems implausible as consumer debtors with recurring obligations on utilities, mortgages, and credit

24   cards.  Additionally, because there is no information about whether Debtors' separation, it is

25   impossible to tell whether payments were made to or for the benefit of insiders.  Because it appears

26   debtors' children attend private school, it seems likely that some disclosure is necessary here because

27   the payments for their tuition should be disclosed here.

28                 --Debtors state that they engaged in post-petition borrowing in July, August and

September 2011 (Ct. Dkt. #s19, 46, 47, Monthly Operating Report at 1:14).  There is no additional information about this.  Debtors should elaborate on this with the date, amount, lender including address and contact information, terms, and any repayment.

--It is unclear how much Debtors are charging or collecting in rent on their property in Hawaii.  On the Schedules to the Balance Sheet, Debtors state the scheduled gross rent is $8,000, but when it reduced by a vacancy factor of $1,500, the scheduled net rents are $6,500 (Ct. Dkt. #19 at 3). This suggests that the actual rental rate is $8,000, but for certain accounting purposes, Debtors may report a modified reduced rental rate to take into consideration the vacancy factor.

For August and September 2011, Debtors state that they collected $6,500 in scheduled net rent each month (Ct. Dkt. #s 46, 47 at 3) and actually collected $6,500 in rent each month (Ct. Dkt. #s 46, 47 at 5).  This appears to be supported by Debtors' bank statements (Ct. Dkt. #47 at 11; Ct. Dkt. #46 at 22).    If they actually only collect $6,500 in rent each month, then it appears Debtors overstated their scheduled gross rental rate at $8,000.  Debtors should elaborate.

Debtors also state that they collected $6,500 in scheduled net rents for July 2011.  *Id.*  Yet for the Statement of Cash Receipts and Disbursements, Debtors state they did not collect any rent.  *Id.* at 5.  Debtors should amend to clarify this titration.

--Debtors have scheduled among their cash receipts "Misc.—Horse" (Ct. Dkt. #s 19, 46, 47 at 5:10).  This is not otherwise disclosed or described in detail.  It should be and should be added to Debtors' income calculation for plan payments.

--Debtors state they are delinquent in the amount of $7,549 in post-petition taxes for August and September 2011 (Ct. Dkt. #s 46, 47 at 2:21).  Debtors should elaborate the basis for the delinquency and their plan to cure the delinquency.

--Debtors do not provide complete information about their bank accounts and expenses.  Debtors identify five or six bank accounts (Ct. Dkt. #s 19, 46, 47 at 3-4).  For July 2011, Debtors do not provide statements for their accounts with Delta Community Credit Union or Wells Fargo.  For August 2011, Debtors do not provide a statement for their account with Delta Community Credit Union.  They also do not provide copies of checks for the statements from Wells Fargo or American Savings Bank.  This makes it impossible to identify the recipient of six checks ranging

from $200 to $1,800.  The same is true for September 2011.  Debtors wrote five checks between $200 and $1,800 without providing any information about the recipients.

--Debtors' bank statements reflect a $450 payment to a "Realtors Association" on July 1, 2011 (Ct. Dkt. #19 at 9).  Debtors do not disclose their employment as real estate brokers, or the listing of any property for sale.  Debtors should elaborate on this expense.

--Debtors' bank statements reflect nearly $1,000 spent at the Four Seasons Resort on July 19, 2011 (Ct. Dkt. #19 at 11).  Debtors should explain the necessity of staying at the Four Seasons and the impact on their income attributable to the plan.

--Debtors' bank statements reflect three charges totaling $4,500 for JN Exotics on June 30, 2011, and a check for $12,025.18 to JN Automotive negotiated on July 1, 2011 (Ct. Dkt. #19 at 16, 20).  Debtor should elaborate on this expenditure and the impact on their income attributable to the plan.

--Debtors' bank statements disclose a $500 check paid to "PNC Jonathan Flanagan" on July 27, 2011 (Ct. Dkt. #19 at 23-24).  Debtors should elaborate on the purpose of this payment since it appears to be to or on behalf of an insider.

Dated this 1st day of November, 2011

ARMSTRONG TEASDALE LLP

By:    /s/Louis M. Bubala III
       Louis M. Bubala III, Esq.

Counsel for Tilzoni, LLC